Okay, I'm ready. May it please the court, Joseph Klapich for the appellants, and I am joined here today by two of my clients, Rachel Scanlon and Stephen Sawyer. I'd like to reserve three minutes for rebuttal, at least I'll try. And before I begin, there's a procedural issue. We did file a reply brief in this case. An unredacted version was attached to the motion to seal, which has not yet been resolved or ruled on by this court. And so I just wanted to encourage the court to decide that motion and make sure that it reviewed the reply brief before deciding the case. We certainly reviewed the reply brief. Thank you. So turning to the merits, let me start with the summary judgment on the judicial deception claim. The warrant application gave three reasons for removing KX and GX from their home. First, Rachel and Stephen were giving KX cannabis oil, quote, without medical consultation, unquote. Second, KX's teacher, Ms. Turner, had repeatedly observed KX at school in a heavily intoxicated state. And third, Rachel and Stephen refused to cooperate and were not forthcoming about KX's treatment. Viewing the evidence in the light most favorable to my clients, which is the applicable standard here on summary judgment, none of these reasons were true. And all of them were highly material. No probable cause would have existed to remove a profoundly autistic child and her sibling from parents who were consulting with a physician to implement a lawful, prescribed, and effective treatment for their daughter's severe behavioral disorders. Let me address each of these reasons in turn. First, the warrant stated that Rachel and Stephen were giving KX cannabis oil, quote, without medical consultation, when in fact Rachel and Stephen had twice consulted with a physician, twice obtained a physician's written recommendation for the treatment. Okay, so what's relevant, and I just, because this will be distracting, what's relevant for the judicial deception claim is what the social worker knew, not what your clients had done, but what they told the social worker or alleged that they told the social worker that didn't make it into the warrant application. And I'm sure that's what you mean, but the outset is this is going to be a long sequence of facts, and the facts that the social worker was not aware of don't count, right? Correct, and I acknowledge that, and we've addressed that in our briefs. All of these facts that I'm asserting as being established that the social worker knew about when she affirmatively misrepresented them or omitted them in the warrant, all this was known. They were disclosed by Rachel during the September, I believe it was, 15th initial consultation, and then they were disclosed again when she provided the written recommendations to the social worker, Elorte, which Elorte acknowledges in the warrant. And then there was a follow-up meeting September 19th in which, again, all this information was conveyed again. So I agree, and in all of my remarks I'm talking about facts that were known. Well, facts that your clients – viewing the facts in the light favorable to your clients, your clients said they disclosed to the social worker, right? Correct. That's fair game. Okay. Correct. These are facts that are disclosed to the social worker. All right. And I think the critical language here on this issue is on page 1637 of the excerpts of record, and that is under the heading conclusion in the warrant in which Elorte states, quote, father and mother are treating child, minor, KX as autism, with cannabis oil and have not consulted with a medical professional or a professional who deals with autism. And then she states that this is endangering the child's emotional – the physical and emotional well-being of the child. And that assertion, which is the primary basis for removing the children from the home, was completely false. Rachel and Stephen had consulted twice with Dr. Mendelsohn on July 28th, 2017, and then again on August 28th, 2017, Dr. Mendelsohn had conducted a physical examination, determined the benefits of medicinal marijuana here outweighed any potential harm to the health, and given her an initial one-month prescription, which was provided to Ms. Elorte. Then in August, he conducted a follow-up consultation, during which he found that KX was responding favorably to this treatment, and he ordered it to be continued on an ongoing basis and provided a lengthier prescription. In addition, Rachel and Stephen disclosed to the social workers that they were having weekly check-ins with a dosage specialist from a group called Canna Kids, and that was with Dr. Mendelsohn's knowledge and approval. And I would note there's a stunning admission at page 28 of the answering brief that I really want to bring to this Court's attention. It says, appellees at that point in the brief say, quote, the dependency court would certainly have granted the warrant because DCFS's primary concerns were the lack of supervision of the marijuana treatment by a medical professional. So appellees concede in their brief that the primary concern that justified removing these children from the home was the supposed lack of medical supervision, and the evidence showed that they knew that that statement they had made in their warrant was false. KX's treatment was being medically supervised. In fact, Rachel and Stephen had consulted with Dr. Mendelsohn only two weeks before the September visit and one month before the filing of the false warrant application. How could a false statement about the primary concern for a child's removal not be material? Second, the warrant falsely states that KX's teacher had repeatedly witnessed KX in a heavily intoxicated state at school when, in fact, the teacher, Ms. Turner, told Alerti that she had never witnessed KX, never personally witnessed KX in an intoxicated state, and believed that KX was more talkative, compliant, well-behaved, and calm with the new medication. So again, it's not helpful when you say when, in fact, because this is a summary judgment, and I think what you mean, right, is that the record before the court at that time would have been an allegation that the teacher said that didn't happen. Correct. The district court had that from the teacher. Correct, and that's what the teacher testified. She testified at length in her deposition. She said, I did speak with Alerti. I never told her that I witnessed KX stumbling around at times and close to falling over. I never told her that KX had to be assisted, almost carried out due to her intoxicated state. I never told her that she had droopy eyes, that she had a delayed response, that she's staring off into space, that she seems so affected by this medication she's unable to write her name or keep her pencil straight, that she appeared to be under the influence. I never said any of these things. In fact, in this way, the allegations, the evidence in this case is very similar to Constandage, where you had a social worker who falsely represented a witness's testimony in the warrant, and the court said, well, that's a judicial deception claim. You can't do that. Did Ms. Turner tell Alerti that she had heard from an aide that KX had stumbled? Ms. Turner testified at her deposition that she had heard from an aide that she had witnessed, the aide had witnessed KX stumbling. However, she also testified at page 1457, volume 8, that she never told Alerti about that report. And so at trial, I think your position would have been, at summary judgment, I think your position would have been that at trial, it's up to the jury to decide who to believe. Exactly. They may have believed the social worker. They may have believed the teacher. Exactly. It's a tribal issue of fact, which is the issue that we have at summary judgment. And I would note that even if this idea of – Can I finish up on that? Just one minute. Forgive me for interrupting. So for purpose of your judicial deception claim, the question we look at, of course, is what was put before a magistrate judge or the judicial officer. So was your point with all of this that, in addition to the one you just made about the contested issues of fact at summary judgment, that the judicial officer wasn't in the position to know that these were contested facts? The judicial officer should have been disclosed the truth, and the truth viewing the evidence in the light most favorable to my client, meaning if – maybe this is the best way to put it. If – here's a simple way to test materiality here. All this court has to do is think about what the warrant should have said, meaning that if Olorte had accurately recited the information that she knew at the time that she was putting together the warrant to the juvenile court, and then this court should have asked, would that have been enough to remove the children from the home? So first, she should have said, Rachel and Stephen were treating KX's severe autism after twice consulting with Dr. Mendelsohn, after receiving written recommendations for the treatment of medicinal marijuana from Dr. Mendelsohn, and were consulting weekly with a dosage specialist with Dr. Mendelsohn's knowledge and approval. And KX's teacher, who was the person who most directly interacted with KX at school, had never seen KX in an intoxicated state and thought the new medication was working well and improved her behavior. So in other words, I think the answer to my question is yes. I think your complaint – I'm not using that as a term of art. I think your point is that for a judicial deception claim, we looked to see what was put before the judicial officer, and the judicial officer did not have a way of knowing that some of these assertions were actually contested. Well, it's not that they were contested. They knew they were false. Well, that's your client's position, actually. Or they omitted material information. That's your client's position. Well, the judicial officer didn't know that. Correct, and that's the point of the judicial deception claim. It was an ex parte proceeding. Olarte knew it when she was filling out the warrant application. I don't mean to belabor the point, and I think we're in agreement on this point. But it is for the jury to decide who they're going to believe, right? And you're advocating today for your client, and at summary judgment, of course, we look at the facts in light most favorable to your client. I appreciate all of that. But just going back to the judicial deception claim, it seems to me that what you're telling us with some basis in the record is that some statements in the warrant application were treated as uncontested, that were in fact contested, and that the social worker knew they were contested. I think they were more than contested. They were false. You're saying they were materially false. Yes. When she says they were giving her this treatment without medical consultation, that's false. They consulted twice with Dr. Mendelson. She knew it. She had received already written recommendations from Dr. Mendelson. And let me, and I think this is an important point, she buried her head in the sand, which is deliberate indifference. And she said, Oh, I tried to call Dr. Mendelson. This biting off more than you need to chew is all I'm saying. This was a summary judgment count. Correct. And the case that I would cite, Your Honor, that's squarely on point, is the Reedy decision, 615F3rd, page 213. And that court says when you're evaluating a judicial deception claim, you have to review the record in the light most favorable. We know that. Right. Thank you. Can I get you to take a breath here for one moment? Judge Feibe, do you have additional questions? I do have some questions about the Monell claim. Okay. I'd like you to describe for me briefly what you think the Monell claim is. The Monell claim is based on the conduct we believe happened here, which is what happened in this case was Olarte, when she was filling out this warrant application, only put in the facts that she thought were helpful for removing the children from the home. Well, that's your judicial deception claim. Well, no, no, what I'm saying is. Correct. So the Monell claim builds on that. Right? So the Monell claim alleges that the county had an unofficial policy, a longstanding practice or custom, and or a failure to train its workers about including exculpatory information that they know about in the warrant applications. What supports that? The support of the record. First, we have the testimony of Shook, who testified at page 1318, that he's not aware of any policy that specifically informs the social workers that they're supposed to include exculpatory evidence or information that negates blame or guilt in court filings. And then I think the most damning evidence on this, on the Monell claim, is the testimony of Hashizumi, who's an experienced social worker. This is found at docket number 150-2 at pages 41 and 42. And the testimony here, she said, you know what, I had training on this, and they told me that in a warrant application, the information that we should provide should be, quote, exclusively limited, unquote, to those facts that weigh in favor of removing the child from the home. In other words, Hashizumi testified that if I'm aware of facts that aren't helpful in removing the child, I should just exclude those from the warrant application. That's what I was trained to do by the county. And our position is, and there's more evidence that we cite in our brief about the fact that you have a social worker, Harris, who testified at page 1143 of the record that she had never received any specific training from the county on her constitutional obligation to include exculpatory or mitigating facts. You have another senior county official who admits that he's aware of circumstances where social workers were misrepresenting information in warrant applications and no steps were ever taken to discipline or adequately inform or train those social workers. I'll tell you one of the things that concerns me in the record, and I don't know whether it's a part of your Monell claim or whether it's at issue here at all, is that Ms. Olarte files her Statement of Cause, her SOC, which she prepares on September 26th, and I don't see any recitation anywhere in her SOC of the standard for issuing a warrant to remove the children. So I don't see that she's tried to tie this at all to California law, which I think would be Section 340. Correct. Let me finish. Go ahead. She hasn't cited the standard anyplace, which requires two things, that you have to show some kind of substantial harm, and secondly, that there are no alternatives. There are no alternative ways of solving this. Once the warrant issues, a couple of days later, she prepares something for the superior court on the, I think this is the 300 hearing. And this time the standard is stated, and she provides additional evidence that was not provided in her SOC, including that she offered to the Scanlans that CPS said that they would like to work with them on the dosing and help them to make sure that it all was right, at which place Mr. Scanlans says, you're just trying to take over our kids, we're not going to do that. None of that appears in the original SOC. So I'm concerned, and particularly where she was also using a check-the-box form, that there is no recitation of the California or Fourth Amendment standard for removing a child. Is that a part of your Monell claim, or have you made that allegation? We have. One of the points that we've made is that there's a complete failure to train the social workers on the standards that apply to removing children from the homes. Could you give us a citation to this allegation and the complaint? I think that's the question. Have you made that allegation? Or maybe when you come back? Maybe I'll come back to that. But the claim as part of the Monell claim is that exculpatory information is not being provided and that there's an utter failure to train the social workers on the standards that apply for removing children so that they're not even aware that they have to include exculpatory information. And I think the fact that you have legal standards that are not being even provided to the judge, that you have social workers who don't appear to be even aware of those legal standards or at least being coy about what those legal standards are, I think those all fall into the Monell claim. The record does reflect that Ms. Olarte and her supervisors did consult with legal counsel at some point. I think that's true, and then the point is that then it wasn't reflected in any of their actions in terms of how they interacted with the court, and it wasn't reflected in the other evidence supporting the Monell claim. And so I think there's enough here under this Court's Kirkpatrick and Oviatt cases which both approved, at least found tribal issues of fact on Monell claims based on the testimony of social workers about unofficial customs or practice or in the case of the Oviatt case, there was a senior official who knew these constitutional violations were taking place  But you wanted to save some time, and you're running short of it, so should we stop there? I will stop there. Unless the Court has any further questions, I'll stop and reserve the remainder of my time. Okay, thank you. Thank you. Good morning. Good morning, Your Honors. Ovi Berkowitz, may it please the Court. Ovi Berkowitz on behalf of the Social Worker Defendant Senate County Appellees. So just picking up right there on the issues with respect to the motion for summary judgment. I really think it's important to be very clear on this issue with respect to what was being represented as to the alleged misstatements and materiality. So if we can just break it down. The first issue, a lot of time has just been spent now on Dr. Mendelson. So we have, Your Honors, a seven-page statement of the case, single-spaced, very detailed, about the events that led to the warrant. In there, it reflects that the mother discussed with Ms. Olarte that the important point is that the oil was prescribed by a doctor. Dr. Mendelson is mentioned in the statement of cause. Lots of information is mentioned about the parent's position. Lots of exculpatory information is mentioned about the parent's position. Then why in the conclusion does it say, have not consulted with a medical professional? Because, I'm sorry, Your Honor, I will focus the answer. I'm sorry, I cut you off. Yeah, go ahead. Why do we have in the conclusion, have not consulted with a medical professional? And I will explain. Because the parents admitted, and it's in the record, pages 400, page 399, page 408, 413, 419, that the parents admitted that this child, there was a prescription only that was by Dr. Mendelson, that they saw this doctor one time and one time on the phone, that was just a prescription, a generic prescription, not for THC. And this is the important part that's being misrepresented, just a generic prescription. So, Your Honor, I'm going to answer your question. The parents admitted that there was no consultation with, and, Your Honor, it says no consultation with any doctor with respect to the dosing, with respect to going back and forth, experimenting. There's a word dosing in that paragraph. I'm looking at the conclusion to Ms. Olarte's statement of cause. Do you see the word dosing in there? Not in the conclusion, but in the generic sense. Okay, I'm not interested in the generic sense. I'm interested in the conclusion that says, have not consulted with a medical professional. They haven't consulted a medical professional other than that one time with respect to getting a prescription. Other than that one time. Well, that would be one time in which they have consulted with a medical professional. But, Your Honor, look at the entire context of this. If we're going to drill down to one sentence, it says they have not consulted with a medical professional or a professional who deals with autism, which is true. They did not. It is undisputed. Dr. Mendelson has no experience as a pediatrician, no experience with autism, all of that. In the entire context, Your Honor, if you're drilling down on one sentence of a seven-page report, it's true. There was no consultation with the — if we're just going to add the word about dosages, that's the entire case with respect to what was going on. All the prescription, that's it. That's what this medical professional did. He wrote a prescription for marijuana. But that is a — that's a consultation. It may be an inadequate consultation, but it is a consultation.  It's a seven-page report. You're suggesting that no such consultation existed. It's a seven-page — no, but that's true because you're talking about in a seven-page report where there is discussion brought by the mother who is talking about, on the page 232, it's — what's important is that the oil was prescribed by a doctor. That's all that was done. That was the consultation. It was a prescription for oil. That's it. That's — Counsel, what is your strongest argument, since you're talking about context? The context is this was a summary judgment ruling. Yes. Right? Yes. So given these conflicting facts, the teacher said I didn't say that. The mom said I disclosed that. The social worker said she didn't. And they're — what's your best case that a jury couldn't decide that these were — that material misrepresentations were made here? Okay. So I think my strongest issue is because the courts state, as the courts well aware, that if you take an X out of certain language, and what is left in the warrant is enough to justify the probable cause — Well, sometimes we take stuff out of warrants, and sometimes we put it back in if something was omitted. So I'm asking for your best case scenario. My best — That this — that a jury couldn't have found that there were material misrepresentations here. And I'm going to listen carefully. Well, the court decides the materiality. So — Okay. Fair enough. So, Your Honor, that's the important point. It's not the jury. It's the materiality. And I want to answer. I want to answer. All right. And the answer is this, that this — with respect to the teacher, as the court has already noted, the information — we're talking about two referrals — two referrals that went to the — that went to the social worker, referencing the patient — I'm sorry, the minor being someone who is lethargic, stumbling. We have the stumbling attributed at least at the minimum to the — from the teacher's aid. We know that information is being provided by the parents, if conceded. In their — did Ms. Olarte ever identify that teacher's aid? Not in the statement of cause. Okay. Was it identified anyplace else in the deposition? Did she talk to an aide? She could not — This is the information that was left on the phone, right? But — okay. Yes, but here's the thing. It's the — what difference does it make in terms of materiality, whether it's a teacher's aide or a teacher? Well, it's a — it's just a complaint line. And so that's why she goes over to verify this, according to Ms. Turner. Ms. Turner was not going to verify this. Ms. Olarte doesn't say she ever identified the aide. We don't identify her by name. She doesn't say, I talked to an aide whose name I never got. Ms. Turner verified that a teacher's aide did this. So if we're talking about — the point is, what is the materiality? The point is, we have evidence that she's stumbling. We have evidence from the parents in the record that — page 420, page 421 — that the And during a particular time of experimenting with the dosages, she was having difficulties. So we have the evidence in there that reflects that this child was not doing well with this type of medication. That is the materiality that I think a bench officer can look at all this information and say, okay, well, this child is — How does that satisfy California's standard? This may go a little bit to the Menil question. I'm a little puzzled. But I pulled all the statutes yesterday, and I don't see that Ms. Olarte has tried to relate her findings to the California statutory standard for obtaining a warrant. Now, in the later statement that she prepares for the juvenile court, she does recite the standard, and she comes up with some additional adjectives and some additional language. But it's sure not in her statement of cause. Well, there's two things. Okay, so one is — I have to concede to Your Honor. I'm not prepared to talk about that in terms of the detail, because that wasn't really identified in terms of the appellate's arguments in terms of what Ms. Olarte did. But I do know a judicial officer signed off on it with respect to the information that is in there. What came about later, there was additional information. There was efforts to contact a Dr. Bonnie Goldstein that came up. There was efforts the entire time to contact other people. So there was more information that came out later with respect to the petition. And I think this is where it gets muddied a little bit. There's two things. One is the statement of cause. The child is detained. But then there's a hearing that comes out later, and there's a petition where counsel is referencing a Hashizumi. She does — she files juvenile petitions. And I understand it's dependency court. It's a lot of stuff. It's confusing, even to me, in a sense. But that's a juvenile petition. That's different than the warrant package. Yeah. The juvenile petition is the 300 proceeding, right? Yes. Okay. The standard is not too far off from either the 340 warrant or the 306, which is the warrantless removal. It's different because here we're putting in information to get a bench officer to sign off on if there's enough information in there to detain the child. The petition is later with respect to if there's enough to hold the children over. And in this case, I will remind the court here — this is an important point. What happened — and this is in the record — what happened at the hearing? It was the parents saying, well, we now are going to guarantee that a pediatrician is going to oversee this, which is pretty much a concession. It wasn't before. And what did the hearing officer — no, the judge do? The judge said, okay, we're going to hold the kids — we're no longer going to hold the kids over. The kids return back with the parents. That's the thing that changed afterwards. And your point is what? My point is that things changed between that time. Five days later. Yes. But at the time that the warrant was applied for, isn't there evidence in the record that some of the information that was put before the judicial officer was materially false? And if that is true, doesn't that create a genuine issue of fact, making summary judgment inappropriate? I don't think it's material. Wait a minute. Wait a minute. Wait a minute. I don't think it's material. Two judicial officers' material? Because this is what I was trying to engage with the opposing counsel, and I didn't have much luck with him either. But Judge Vitaleano's point is that once in a great while — and it does not happen very often — qualified immunity is denied because we think that on the record, a jury could actually find not that witnesses were mistaken, but they're being untruthful. And if that happens, I think what Judge Vitaleano's point is, that's a game changer. Okay. So every time someone is going to dispute, if the parents and every — Not say every time. No, but that's what — What I mean by that is it rarely happens. But on this record, I want to give you every opportunity to tell me on this record, and I gave opposing counsel the chance to, why would I decide, if I were the trial court judge, that on this record a jury couldn't decide that the social worker was untruthful? Okay. Because, again, I think we're talking about two different things. Untruthful is — I'm talking about untruthful. I understand. Okay. Untruthful is different than materiality. Untruthful — I know that. Right. So what we're saying is — What I do for a living. But I want you to speak to untruthfulness, because my point, counsel, and I'm not — you know, this is serious. I really need you to engage in this for me. For example, the teacher didn't say what the warrant application said the teacher said. It may have been very important to the judicial hearing officer that the person who was in charge in that classroom was observing things that make the removal of the child appropriate. How more material do you need? Well, I think there — I mean, I have to — obviously, that's not — I'm not going to be able to argue that in terms of the teacher says one thing. Partially is, I think, still accurate in terms of the child taking medication, maybe reacting differently, a teacher's age stumbling. But, yes, there is a difference. I'm not here to dispute that there was a difference — But is your point about materiality, when I'm trying to go to veracity, is your point that if — that on this record, a jury could only decide that the social worker was untruthful about points that don't matter? Yes, I'm saying that for materiality, we're talking about two separate things. Okay. So you're prepared to concede that there's untruthfulness, that there are untrue statements in the SOC, and now you're going to tell us as to why those are not important. Is that your position? I think it is. First of all, I never said it was untruthful. I mean — I understand, but don't you — but aren't you conceding for purposes of the argument today that you have to take those statements as untruthful because they are contested in the depositions and other evidence? The district court — But you're going to go to a second point, which is, assume that they're all false. They're not material. Well, yes, because that's the case law. The district court, first of all, acknowledged that there was a difference between what the parents said and what the teacher said. Okay. So you just want to tell us that these statements are not — the statements attributed to the teacher and the statements about not consulting with a medical professional are false. Now, why are those not material? I think I've tried to explain it. I think that material — I think that if you look at the context of this seven-page statement of the case — Okay. Let me take you in a little bit different direction, and I may be off just a little bit on frolic and detour. But I keep going back to the statutory standards, again, that were not recited here, because I think it may be important. As a judicial officer, if I were deciding a warrant, and I've got a couple of facts that may be — that are false, knowing how material they are may depend on what the standard is. So what was CPS judging here? What basis did CPS have for judging that KX was being overmedicated? According to what? According — that's part — that's one of the second elements I didn't get to, but a part of the mother not being forthcoming. Right. Okay. But let's suppose that they knew the dosage. How did they know that the dosage, if it was 10 milligrams — I think that's what Dr. Goldstein testified to, would sort of be a standard dosage, and she had some concerns because they had gone from 10 to 15. Now, what does CPS have for judging that 10 milligrams is not appropriate and endangers the child? I really hope I'm answering your question. I'm really trying to, and that is — Right. But this is an entirely new area, and CPS is just making it all up. No, no. What they're doing is — the fact is that there is no doctor that's involved — I think that's undisputed. There is no doctor that is involved with the dosing at this point. They concede that. If they had had Dr. Goldstein looking over their shoulder every day as they administered this, what would tell CPS that this was too much of a dosage? What medical standard is there for CPS to be judging? I don't think it's unreasonable for CPS to be concerned at the very minimum. Right. The concern is not the statutory or the Fourth Amendment standard. That's the standard that was put in the Statement of Cause, that they were concerned — Yeah, but that's not California's statutory standard, and it is not the Fourth Amendment standard. But that is not a standard to find that it's a material misstatement based on her concerns that there was no pediatrician overseeing. If a bench officer thought that that was somehow not important, he wouldn't have signed the warrant. I think we're fighting with a bench officer then. She was concerned about all the things with respect to the dosing, with respect to no medical oversight, that her own pediatrician was deliberately not told about this information, didn't know anything. Look at all the information that Ms. Olarte tried to get. She tried to talk to a pediatrician. She tried to talk to Dr. Goldstein. She tried to reach Dr. Mendelsohn. Could not reach Dr. Mendelsohn. She tried to talk to this — it's an online cannabis service. So she's really trying, and that's all information that's in the Statement of Cause. So I think that Your Honors are fixated on the issue, and I'm saying it by not — But she — and she also told the judicial officer that the teacher, in effect, saw the child intoxicated. Yes. Which might be very powerful evidence that there was overdosing. Well, first of all, I don't — Even if — I'm sorry. I apologize. But it wasn't true. Okay. The teacher didn't say that. First of all, I don't think the word intoxicated actually is in the Statement of Case. It's not there. That's a word that was mentioned. But sleepiness, drowsiness, are we going to fight over this? That was conceded by the parents. So whether intoxicated is the word or not — I'm sorry. Go ahead. No, I'm saying — I think there is information in here, if the Court looks at all seven pages, that reflects genuine concern about a child who is not getting any medical oversight of dosing and has all of these issues going on and is bringing that to the attention of a bench officer after consulting with county counsel, a supervisor, and doing the diligence of about two or three weeks of work and trying to get information and is unable to get information. None of that is disputed. We're not talking about any of that. And I think that's all in here. And I think that reflects, I think, a genuineness of why the Court — What do we do about the fact that this was at summary judgment and that in the teacher's deposition testimony, she made a striking number of statements that say, I didn't say that, I didn't say that, I didn't say that either. What about that? That's what the judicial officer did not know, to be sure. But at summary judgment, that was known. And I think — and I would have to repeat what the district court said. And I understand the Court looks at it de novo, but — I'm all ears. I want to give you every shot at this, because I'm not understanding your position on this. Because the trial court looked at that and said, even if what the teacher said, and you just take the statements that I have mentioned, what a teacher's aide referred to or anything else, you still have all of the other information that I've given to you that the parents were not — If you believe the social worker. If you believe the social worker. And what I'm trying to get you to embrace is the notion that on this record, a jury could decide that this is one of those rare cases where a social worker was not truthful. And if that is true, I mean, if that is a possible conclusion for them to have reached, not an unreasonable stretch in my view, on this particular record, then that's a game changer, counsel. And I haven't heard you respond to that. I've responded. I've tried to respond. The response is the same. And here it is. Your response is what? My response, again, is that even if you take the teacher's information out, there is still no dispute on the core facts, on the facts of that this child was getting medication that was not being regulated. They were calling cosmetologists in Delaware to try to get the information that the social worker was concerned about. Those core facts are not in dispute. They're not. So, yes, there is a dispute about what the teacher said. I understand. I'm not trying to minimize it, but I'm saying if you take out that statement, that is what the district court said. You still have— But it's not that simple because there are also disputes between what Mom said to the—forgive me, but—Scanlon said to the social worker what the social worker said. And so then, right, if a jury were to decide that the social worker was not truthful in her interactions with or relating her interactions with the teacher, the jury may well come to the same conclusion and question your client's veracity vis-a-vis the conversations she had with the parents. Everything I've just mentioned— It's not as compartmentalized as you're presenting it. No, but everything I've mentioned right now is not even issues that are disputed by the parents. Everything I just told you about the oversight of the medication, the lethargy of the child, all that information, the information that— The parent's view is also that they had a really terribly disabled child. They had tried everything and were desperate, and this treatment was helping her in a big way. Where is that disclosed? Okay, that is disclosed in their—again, it is in the statement of case because where there's information where the mother said that the child had tantrums and headbanging and the medication has helped. That's all here. It's a pretty watered-down version. We've all read this repeatedly, but— It's all here. That's what I'm saying. All the exculpatory evidence, it's all here. If you look at everything, all of the information Your Honor just mentioned, it's all in the statement of cause. It's all there. I just have one last question. As to the little one, the five-year-old, why was there cause to remove her from the home? Well, again, there was a trial on that issue as well. I'm just asking you, on this record, do you think there was cause to remove the five-year-old from the home? There was cause for the basis of access to medication. That was what was in, and that's why the trial judge said there's not enough. That was going to go to a jury, and it did. There was a trial on that basis. And your position is this record warranted removing the child from the home? I'm saying that the—I think now we're—yes, I think that at this point, the trial judge said that there was not enough, and that's why there was a trial for the second child. I was asking for your client's position now, looking back with 20-20 hindsight, which I appreciate people didn't have at the time, but that's the county's position. Well, it was the position at the time, yes? Thank you. Let me just launch in, I think, now that I fully understand what Your Honor was saying. I think what happens here is this case goes in front of a jury, and a jury looks at the facts here, and they see, as Your Honor mentioned, a family that has a severely autistic child with very serious self-injuring behaviors. They're at wit's end, and they try a legal but somewhat controversial medical treatment. You have social workers who come in with a preconception that this particular type of medical treatment should never be given to a child, and I think a jury could look at this and say, gee, she represented in the—O'Larty represented in the warrant that they did this without any medical consultation. That's false, and O'Larty— Counsel, I know I'm interrupting you, but you don't have a lot of time, and opposing counsel just made his strongest argument. That's not what the jury found. That's not what the jury found on the judicial deception claim. Correct. On the sister. How would the evidence have differed? Because the judge excluded all the evidence about the marijuana and the removal of the sister. Did the jury hear about the conversation between the social worker and the parents? No, that was all excluded. The sole focus of that trial was whether or not— Lockbox. It seemed to be all about the lockbox. Yeah, it was all about the lockbox. And so the judge, after having gotten rid of these other claims, the judge in limine motion said basically, we're going to narrow this down and focus this on the specific grounds that they had asserted for removing the younger daughter, which was the fact that she had potentially access to this information, to the medication, and that was the whole purpose of the trial. So they wouldn't have heard, according to my notes, just sort of reverse engineering this, they wouldn't have heard from the older child's teacher or the teacher's aide. Correct. And they did not, in fact. All of that evidence was beyond the scope of the trial because it was focused. What did they hear? Who testified? At the trial? Yep. It was the parents and several of the social workers. And did they describe the conversations, surely the meeting they had between the social worker and the parents that did not go well? Correct. There was testimony by both and sharply conflicting on that. But like I said, the sole issue that was before the court and before the jury was access to the lockbox. Who else testified? I'm sorry? Who else testified? I don't have an exhaustive list here, but like I said, the parents and the social workers, Allarde and Harris, who was in attendance at the September 2000 meeting. But the doctor, I'm sorry, there was no medical testimony. There was no testimony from the teacher. There was basically no testimony at all about KX other than the background facts that she was taking this medication and that the younger daughter was potentially exposed to it or potentially had access to it. If I could make just one last point before I sit down. I didn't get a chance to talk this morning, although it's briefed, about the Fourth Amendment claim of the in-school interview. And I'm not going to try to argue it. But I would ask this court, if this court were to conclude that that issue was not clearly established as of the April, I'm sorry, the September 2017 behavior. I would ask the court to please publish and make the law clear on that issue so that what happened to GX in her school doesn't happen to other children going forward. And with that, I will submit. Thank you. Thank you both for your careful argument and for your patience with our many, many questions. Thank you. We'll take this under advisement and stand at recess. All rise. This court for this session stands adjourned.
judges: BYBEE, CHRISTEN, Vitaliano